UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


United States of America

    v.                                    Criminal No. 18-cr-118-LM
                             Opinion No. 2019 DNH 109

John Hernandez



**O R D E R**

On March 26, 2018, a New Hampshire State Police Trooper
pulled over John Hernandez after observing him commit a minor
traffic violation while driving on Interstate 95.  During the
traffic stop, the Trooper questioned Hernandez, asked him to
exit his vehicle, obtained his consent to search the vehicle,
and found contraband.

Hernandez is charged with possession with intent to
distribute fentanyl in violation of 21 U.S.C. § 841(a)(1).  He
moves to suppress all evidence seized as a result of the search
of his vehicle during the traffic stop.  The government objects.
On May 16, 2019, the court held an evidentiary hearing on this
motion.  For the reasons that follow, the court grants
Hernandez's motion.

**BACKGROUND**

On March 26, 2018, New Hampshire State Police Trooper
Michael Arteaga was stationed in an unmarked cruiser near the

Hampton tolls on Interstate 95. He testified that he was monitoring northbound traffic traveling through the tolls and that he would randomly pick license plates and run them in his database. He testified that he was monitoring traffic at this location because Interstate 95 is a "known drug corridor."

At approximately 3:30 p.m., the Trooper observed a black Toyota RAV4 with Massachusetts plates drive through the cash toll lane. He observed that the lone driver was male but did not notice his ethnicity. He was able to read the vehicle's license plate number and queried it in his mobile data terminal. He learned that the vehicle was registered to "EAN Holdings," which he knows to be Enterprise Rentals. The Trooper testified that it was significant to him that the car was a rental because, based on his experience, rental cars are used for criminal activity, "specifically drug trafficking."[1] The Trooper also noted that the color listed on the registration was red, while the vehicle he observed was black. He found it "odd" that a new car would be a different color than listed on its registration. After making these observations, the Trooper

---

[1] The Trooper testified that rental cars are used in drug-trafficking for three main reasons: (1) they are more "mechanically reliable . . . decreasing the chance of being stopped by law enforcement for defective equipment violation"; (2) the fact that the vehicle is registered to the rental company hides the driver's identity; and (3) rental vehicles are not subject to asset forfeiture.

pulled onto the highway to catch up to and continue to monitor the RAV4.

Observations of Tailgating

The Trooper caught up with the RAV4 approximately one and one-half miles north of the Hampton tolls. He observed the vehicle in the right-most lane, or "lane one" while he was traveling in the left-most lane, or "lane four." He estimated the RAV4's speed to be between 70 and 75 miles per hour. As he approached the vehicle from behind, the Trooper observed that the RAV4 was "right on top of the vehicle in front of it—about one car length" away. He observed this for approximately twenty to thirty seconds. He then observed the RAV4's brake lights come on in rapid succession and the vehicle slow to approximately 55 miles per hour. The Trooper slowed his cruiser to stay even with the RAV4 and moved into lane two to better observe its driver. The Trooper observed that the driver appeared stiff, had his hands on the steering wheel in "a ten and two manner" and sat far back from the steering wheel such that his body was concealed behind the door frame. At this point, the Trooper pulled directly behind the RAV4, activated his lights, and effected a traffic stop.

<u>Trooper Approaches Car for the First Time</u>

The Trooper approached the RAV4 on the passenger side.
While approaching the car, he noticed two packages of unopened
rubber bands next to some car cleaning supplies on the floor
behind the driver's seat.  The Trooper then made contact with
the driver, Hernandez, and asked for his license and
registration.  At this point, the Trooper could observe that
Hernandez is a non-Caucasian male.  Hernandez provided his
license and the vehicle registration without issue, told the
Trooper it was a rental car, and handed him the rental
agreement.  The Trooper testified that Hernandez appeared stiff
and anxious.  Hernandez inquired why he had been pulled over.
The Trooper replied that Hernandez had been following the
vehicle in front of him too closely and that his car was
described on the registration as red, when it was black.
Hernandez appeared to calm down after hearing this explanation.

The Trooper did not further question Hernandez about his
tailgating or issue him a citation for that traffic violation at
this point, or at any other point throughout the stop.  Instead,
the Trooper inquired about where Hernandez was headed.  The
Trooper testified that his inquiries about Hernandez's itinerary
were not related to the traffic violation.  Rather, the Trooper
inquired about Hernandez's itinerary because he suspected that

Hernandez was engaged in criminal activity—drug trafficking—and he wished to further investigate his suspicion.[2]

The Trooper testified that when he first asked Hernandez about his destination Hernandez was "extremely stand-offish," his "demeanor was cold," and he gave "quick one-word answers." During this exchange, Hernandez told the Trooper to "look him up" and that he had never been arrested. Hernandez also asked the Trooper whether he knew him. Hernandez said that the Trooper looked just like one of his customers at Pep Boys in Salem where he works. The Trooper replied that he had never been to Pep Boys.

The Trooper continued to press Hernandez about his destination. Hernandez explained that he was traveling to the Kittery Outlets off exit three in Maine. The Trooper testified that he knows the Kittery Outlets to be a location where drug transactions occur. The two men then discussed what Hernandez intended to purchase at the Outlets. Hernandez stated that he intended to shop for Hollister jeans. At some point during this conversation, they also discussed the rental car. Hernandez explained that he had rented the car that same day, March 26,

---

[2] To the Trooper's credit, he candidly conceded that he had "something in mind other than the traffic violation" when he decided to stop Hernandez. The Trooper further conceded that once he began asking Hernandez about his travel plans, all his questions were designed to investigate his suspicion that Hernandez was engaged in criminal activity.

because he had recently repainted his own vehicle.  The Trooper estimated that this conversation, which began when he first approached the vehicle, lasted between two and four minutes.

## Trooper Returns to Cruiser

The Trooper then returned to his cruiser.  He ran a license and warrant check and learned that Hernandez had a valid Massachusetts license and had no outstanding warrants.  He also examined the rental agreement, making two notable observations. First, the rental agreement listed the color of the car as black, Gov't Exh. 2, while the registration listed it as red. The Trooper dismissed the color discrepancy as a mistake on the part of the Massachusetts DMV.  Second, he noticed that the rental agreement was dated as beginning on March 22, not March 26.[3]  The Trooper did not contact Enterprise Rentals to investigate this discrepancy.  Nor did he ever ask Hernandez about this discrepancy.  Finally, the Trooper conducted a brief Google search of the Kittery Outlets.  He learned that there is no Hollister store at the Kittery Outlets, and they were observing "winter hours," closing at 6 p.m.

---

[3] As it turned out, Hernandez reserved the car with Enterprise on March 22, but picked up the car on March 26.  The Trooper conceded that Hernandez may have said he "picked [the car] up" on March 26, and that the Trooper may have presumed that Hernandez said he rented it that day.

## Trooper Approaches the Car a Second Time

The Trooper then approached Hernandez's car a second time, this time on the driver's side, and asked Hernandez to exit the car to speak with him further. The Trooper testified that he wanted to continue his conversation with Hernandez because he "was suspicious that [Hernandez] was potentially engaged in criminal activity based upon everything [he] had observed up to [that] point."

Hernandez complied. The two men moved to the rear of the RAV4 towards the passenger side such that they were positioned between the RAV4 and the Trooper's cruiser. Once outside his vehicle, Hernandez became increasingly anxious and exhibited a "bladed" stance.

## Pat-down Search

The Trooper observed a large bulge in Hernandez's front jean pocket. He asked Hernandez for consent to conduct a pat-down search for weapons. Hernandez agreed. As a result of the pat down, the Trooper determined that the bulge was a large wad of cash, that Hernandez explained was "just under" a $1,000. The Trooper also found a small flip phone, which Hernandez described as his "other phone."

The Trooper again asked Hernandez what he intended to shop for at the Outlets. Hernandez reiterated that he was planning

to shop for Hollister jeans and added that he was also looking for Nike shoes.  The Trooper then told Hernandez that he had looked it up and there was no Hollister store at the Outlets. The Trooper testified that, at this point, Hernandez became increasingly anxious and stated that he was being harassed.  The Trooper continued to press Hernandez about the fact that no Hollister store existed at the Outlets.[4]

Trooper Receives Consent to Search

The Trooper then inquired whether there was anything illegal in the car and Hernandez said no.  The Trooper then asked whether there were any drugs in the car.  Hernandez responded that he does not do drugs.  The Trooper asked if he could search the car and Hernandez said yes.  At this point, approximately thirteen to fifteen minutes had elapsed since the

-----

[4] The Trooper testified that he found it suspicious that Hernandez would be traveling to a store at the Outlets (i.e., Hollister) that the Trooper discovered did not exist.  The evidence on this point was hardly conclusive, however.  The Trooper testified on direct that Hernandez intended to shop at a Hollister store.  On cross, however, the Trooper clarified that Hernandez said that he was looking for Hollister jeans and that the Trooper "believe[d]" that Hernandez said he was going to the Hollister store.  The Trooper further testified that, based on his personal experience of buying Hollister jeans, they can only be purchased at a Hollister store.  The Trooper's police report states only that Hernandez said he intended to purchase Hollister jeans.  Doc. no. 15-1 at 4.

Trooper returned to his cruiser to run Hernandez's license and registration.

Around this same time, Trooper Matthew Locke arrived to the scene. Trooper Locke stood with Hernandez while Trooper Arteaga prepared a consent-to-search form. The total time that had elapsed from the moment Trooper Arteaga observed Hernandez drive through the tolls until he generated the consent-to-search form was approximately twenty-three minutes. Trooper Arteaga reviewed the form with Hernandez and Hernandez signed it. Trooper Arteaga then searched the RAV4. He discovered approximately 400 grams of suspected fentanyl in the center console. He then arrested Hernandez. Hernandez was subsequently indicted on one count of possession with intent to distribute fentanyl.

## DISCUSSION

Hernandez moves to suppress all evidence seized as a result of the March 26 traffic stop. He contends that his Fourth Amendment rights were violated because: (1) the initial traffic stop was not supported by probable cause that a traffic violation had occurred; and (2) even if the initial stop was justified, the Trooper impermissibly extended the traffic stop without reasonable suspicion that Hernandez was engaged in criminal activity. Hernandez argues that the evidence

subsequently found in his vehicle should be suppressed as fruit of the poisonous tree of the unlawful stop and extended detention.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. The temporary detention of individuals by police during a traffic stop constitutes a seizure under the Fourth Amendment. See Whren v. United States, 517 U.S. 806, 810 (1996). To ensure that all such seizures satisfy the Fourth Amendment's reasonableness requirement, the court must engage in a two-step inquiry. United States v. Mouscardy, 722 F.3d 68, 73 (1st Cir. 2013). First, the court must determine whether the seizure was justified at its inception. Id. Second, the court must examine whether the "actions undertaken during the stop were reasonably related in scope to the stop itself unless the police had a basis for expanding their investigation." Id. (internal quotation marks and brackets omitted). Where, as here, the defendant challenges the constitutionality of a warrantless seizure undertaken based on reasonable suspicion, the government bears the burden of proving that the seizure was sufficiently limited in its scope and duration. See Florida v. Royer, 460 U.S. 491, 500 (1983); United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998).

I.  Initial Traffic Stop

A traffic stop is reasonable and properly justified at its inception if the officer has "probable cause to believe that a traffic violation has occurred." Whren, 517 U.S. at 810; United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011). "Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." United States v. Pontoo, 666 F.3d 20, 31 (1st Cir. 2011) (internal quotation marks omitted). Courts in the First Circuit have held that even minor traffic violations can justify a traffic stop. See, e.g., United States v. Dunbar, 553 F.3d 48, 55-56 (1st Cir. 2009) (holding initial stop justified based on officer's observation and video showing defendant's vehicle following another car too closely); United States v. Garcia, 53 F. Supp. 3d 502, 509-10 (D.N.H. 2014) (finding initial traffic stop justified based on officer's observation that vehicle in which defendant was passenger crossed once over dashed line and once over solid fog line).

The Trooper testified that he stopped Hernandez based on his observation that Hernandez was following the vehicle in front of him too closely in violation of New Hampshire Revised Statutes Annotated ("RSA") § 265:25.  RSA 265:25, I, provides:

"The driver of a vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the way."

The Trooper testified that he caught up to Hernandez's car about one and one-half miles north of the tolls.  He testified credibly that he observed Hernandez's car "right on top of the vehicle in front of him about one car length" away for a period of twenty to thirty seconds.  Hernandez's car and the vehicle in front of him were traveling at a high rate of speed at that time: 70 to 75 miles per hour.  Given the high speed at which the vehicles were traveling on a major highway, it was reasonable for the Trooper to conclude that Hernandez was following the vehicle in front of him "more closely than is reasonable and prudent."  RSA 265:25, I.  The court finds that the Trooper had probable cause to believe that Hernandez had committed a traffic violation.  Thus, the court finds the traffic stop justified at its inception.

II.  <u>Extension of the Traffic Stop</u>

The next question, however, is whether the scope of the traffic stop exceeded its mission.  "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that

warranted the stop and to attend to related safety concerns."
Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015)
(internal quotation marks and citations omitted).  Because the
purpose of the stop is addressing the traffic violation, the
stop may "last no longer than is necessary to effectuate that
purpose."  Id. (internal quotation marks and brackets omitted).
Accordingly, police authority for the seizure expires "when
tasks tied to the traffic infraction are—or reasonably should
have been—completed."  Id.; see also Illinois v. Caballes, 543
U.S. 405, 407 (2005) ("A seizure that is justified solely by the
interest in issuing a warning ticket to the driver can become
unlawful if it is prolonged beyond the time reasonably required
to complete that mission.").

An officer's "mission" during a traffic stop may also
include "ordinary inquiries incident to the traffic stop."
Rodriguez, 135 S. Ct. at 1615 (internal quotation marks and
brackets omitted).  Such inquiries typically "involve checking
the driver's license, determining whether there are outstanding
warrants against the driver, and inspecting the automobile's
registration and proof of insurance."  Id.  These checks are
permissible because they "serve the same objective as
enforcement of the traffic code: ensuring that vehicles on the
road are operated safely and responsibly."  Id.

Rodriguez teaches that in the absence of reasonable
suspicion of criminal activity or actions taken to ensure
officer safety, further investigation unrelated to the purpose
of the stop is unlawful if it "prolongs—i.e., adds time to—the
stop." Id. at 1616 (internal quotation marks omitted).
Unrelated investigations are permissible only if they do not
prolong the stop. Id. at 1615. For example, in Caballes, the
Supreme Court held that an officer's drug dog sniff of
defendant's vehicle did not prolong the stop and was therefore
reasonable because it was conducted while another officer wrote
the defendant a ticket for a traffic violation. Caballes, 543
U.S. at 406, 409.

In Rodriguez, the officer effectuated a traffic stop based
on a minor traffic violation, asked the defendant and his
passenger about their travel plans, checked both the driver's
and passenger's licenses, and then issued the driver a warning.
Rodriguez, 135 S. Ct. at 1613. After returning their papers and
issuing the warning, the officer instructed defendant and his
passenger to exit the vehicle, had a second officer come to the
scene, and then walked his drug dog around defendant's vehicle,
extending the stop by seven or eight minutes. Id. The Court
held that the officer's conduct prolonged the duration of the
stop beyond that needed to resolve the traffic violation and
therefore remanded for a determination of whether the officer

had reasonable suspicion justifying the extension of the stop. Id. at 1616-17.

Given this legal landscape, the relevant inquiries here are threefold: (1) were the Trooper's actions reasonably related in scope to the purpose or "mission" of the stop; (2) if not, did those actions "prolong—i.e., add time to—the stop"; and (3) if yes, was the additional time supported by reasonable suspicion of criminal activity? Rodriguez, 135 S. Ct. at 1614-16; Mouscardy, 722 F.3d at 73.

### A. Were the Trooper's Actions Reasonably Related to the Purpose or Mission of the Stop?

The purpose or mission of this stop is undisputed: the Trooper pulled Hernandez over for tailgating. The bulk of the Trooper's questions during his first interaction with Hernandez were reasonably related to the initial stop or amounted to routine questions about Hernandez's itinerary. See Dunbar, 553 F.3d at 56 (holding that officer's questioning about itinerary did not exceed scope of stop for traffic violation when there was no indication officer's questions "rose beyond the routine").[5] The Trooper first asked for Hernandez's license and

---

[5] The Trooper conceded that he suspected Hernandez of involvement in drug trafficking before he even initiated the stop. The Trooper's subjective beliefs, however, are not relevant. See Whren, 517 U.S. at 813; McGregor, 650 F.3d at 822. The court must assess and weigh the evidence from an objective standpoint. See Whren, 517 U.S. at 813.

registration, which Hernandez provided—along with the rental car agreement.  The Trooper also explained to Hernandez the reason he had pulled Hernandez over.  The Trooper then asked Hernandez where he was headed and made some small talk with him, during which time Hernandez informed the Trooper that he had never been arrested and that the Trooper could confirm that by "look[ing] him up."  The Trooper asked further questions about Hernandez's shopping itinerary and pressed Hernandez on precisely what he intended to purchase at the Kittery Outlets.

The Trooper returned to his cruiser and ran Hernandez's license and registration and confirmed that Hernandez had a valid license and no warrants for his arrest.  The Trooper also examined the rental agreement and conducted a Google search for a Hollister store at the Kittery Outlets.[6]

At this point, the "tasks tied to the traffic infraction [were]—or reasonably should have been—completed."  Rodriguez, 135 S. Ct. at 1614.  The Trooper should have, upon his return to Hernandez's car, returned the license, registration, and rental agreement, and either issued Hernandez a citation/warning for the traffic violation or sent him on his way.  The Trooper did

_____

[6] It is not clear that the Trooper's Google search prolonged the stop.  The Trooper testified the search was "brief" and there was no evidence to suggest the Google search required the Trooper to remain in the cruiser any longer than it took for him to complete the license and registration checks.

not do that, however.  Instead, the Trooper continued to detain
Hernandez and ultimately asked Hernandez to exit his car.  Once
Hernandez was out of his car, the Trooper noticed a bulge in his
pocket and proceeded to do a pat-down search.  The bulge turned
out to be a wad of cash, which fact added substance to—what at
that point—was a mere hunch on the Trooper's part that Hernandez
was engaged in drug trafficking.  See United States v. Chhien,
266 F.3d 1, 8 (1st Cir. 2001) (officer's suspicions
"understandably escalated" after learning that defendant was
carrying $2,000 in cash).  Thus, viewing the circumstances as
they unfolded, the Trooper's request that Hernandez exit the car
to continue speaking with him was not reasonably related to the
mission of the stop.  Under these circumstances, that request
was designed to advance the Trooper's investigation of suspected
criminal activity.  Cf. Rodriguez, 135 S. Ct. at 1615
(explaining that dog sniff cannot fairly be characterized as
part of officer's traffic mission because it is a measure aimed
at detecting evidence of criminal wrongdoing).

B. Did the Trooper's Unrelated Conduct Prolong the Stop?

The court finds that the Trooper's request for Hernandez to
exit his car prolonged the stop.  As explained above, when the
Trooper returned to Hernandez's car, the "tasks tied to the
traffic infraction [were]—or reasonably should have been—

17

completed." Rodriguez, 135 S. Ct. at 1614.  Instead of issuing
a warning or a citation and sending Hernandez on his way, the
Trooper asked Hernandez out of his car and moved him to the rear
of the car to continue his investigation.  There can be no
dispute, then, that the Trooper's request that Hernandez exit
his car added time, however brief, to the stop.  See id. at
1615.  Thus, the stop survives Fourth Amendment scrutiny only if
the request to exit the car and speak further with the Trooper
was either supported by reasonable suspicion of criminal
activity or related to officer safety.  See id. at 1616-17.
That is the final prong of the analysis.

C. Was the Request that Hernandez Exit His Car Supported by
   Reasonable Suspicion?

The government does not contend that the Trooper's request
for Hernandez to exit his car was related to officer safety. [7]

---

[7] The court acknowledges, as the government points out, that
the Supreme Court has held that an officer may order the driver
or a passenger out of a lawfully stopped car as a matter of
course in the interest of officer safety, without reasonable
suspicion that the person poses a safety risk.  See Maryland v.
Wilson, 519 U.S. 408, 414-15 (1997); Pennsylvania v. Mimms, 434
U.S. 106, 110-11 (1977).  However, the Trooper's request that
Hernandez exit the vehicle was not made as a matter of course
during their initial interaction.  Cf. Mimms, 434 U.S. at 107.
Rather, the Trooper employed the request to initiate a further
conversation, i.e., an investigation, after the tasks tied to
the traffic stop were or reasonably should have been resolved.
The court would reach the same result here if, instead of asking
Hernandez out of the vehicle, the Trooper had returned to the
car and begun questioning Hernandez again while he remained in
his car.

Rather, the government argues that the request was supported by reasonable and articulable suspicion of criminal conduct. Doc. no. 15 at 9-10. To establish reasonable suspicion, the government "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, justify an intrusion on a private person." United States v. Jones, 700 F.3d 615, 621 (1st Cir. 2012) (internal quotation marks omitted). Reasonable suspicion requires something more than a "naked hunch that a particular person may be engaged in some illicit activity," but something less than probable cause that a person has committed a crime. Chhien, 266 F.3d at 6.

In assessing whether an officer had reasonable suspicion, the court may not engage in a "divide-and-conquer analysis" that scrutinizes each factor in isolation. United States v. Arvizu, 534 U.S. 266, 274 (2002). Rather, the court must consider the "totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." Id. at 273 (internal quotation marks omitted). This totality consists of "the facts available to the officer at the moment of the seizure or search." Jones, 700 F.3d at 621 (internal quotation marks omitted).

In considering the totality of the circumstances, the court should examine the basis for the traffic stop as well as what the officer observed moment by moment as the stop unfolded. See

[Chhien](), [266 F.3d at 6]().  The First Circuit has said that the reasonable suspicion analysis "entails a measurable degree of deference to the perceptions of experienced law enforcement officers."  [United States v. Dion](), [859 F.3d 114, 124 (1st Cir. 2017)]() (internal quotation marks and citations omitted).  While showing deference to law enforcement, the court's inquiry must remain objective.  See [Dunbar](), [553 F.3d at 55]().  The court's focus is not the officer's subjective beliefs or intentions, but, rather, "what a reasonable officer in his [or her] position would have thought."  [United States v. Espinoza](), [490 F.3d 41, 47 (1st Cir. 2007)]().

The government points to numerous facts to support the Trooper's suspicion—at the time he requested Hernandez exit the car—that criminal activity was afoot.  The court lists those facts below.

Facts observed before the stop

- Hernandez was driving a rental car, and, rental cars are "utilized for criminal activities, specifically drug trafficking"

- Hernandez was driving north on Interstate 95, a "known drug corridor"

- Hernandez had followed the car in front of him too closely for twenty to thirty seconds

- When the Trooper pulled even with Hernandez, Hernandez had his hands on the steering wheel in a "ten and two" position, appeared "stiff," and was leaning far back from

the steering wheel such that his profile was not visible
due to the door frame

Facts observed after the stop but before the request to exit the
car

- There were two unopened packages of rubber bands next to
  car cleaning supplies in the back seat

- Hernandez was initially "standoffish" and gave "one-word
  answers" to the Trooper's questions about his itinerary

- Hernandez said he had no arrest record and that the Trooper
  could "look him up" and asked the Trooper if he knew him
  from work

- Hernandez appeared "excessively nervous"

- Hernandez was traveling to the shopping outlets in Kittery,
  Maine, a "location . . . where drug transactions do occur"

- Hernandez said he was going shopping to buy Hollister
  jeans, but the Trooper discovered that there is no
  Hollister store at the Kittery Outlets

- The rental agreement appeared to contradict Hernandez's
  statement about the date on which he rented the car

To determine whether the Trooper had a "particularized and

objective basis for suspecting legal wrongdoing," the court must

consider these circumstances in their "totality." Arvizu, 534

U.S. at 273 (internal quotation marks omitted).

In support of reasonable suspicion, the government and the

Trooper relied heavily on the fact that Hernandez appeared

nervous once he was aware of the Trooper's presence on the

highway and then throughout their interaction. The Trooper's

testimony on this point was inconsistent and lacking in

21

objective facts to support such an observation.  The Trooper
testified that once he had pulled his cruiser alongside
Hernandez's car, he "noticed [Hernandez's] overall posture was
stiff and that he had his hands on the steering wheel in a ten
and two manner and his body was concealed by the door frame or
the B pillar."  The court finds it implausible that the Trooper
could observe that Hernandez's "overall posture" was "stiff"
while Hernandez's body was also "concealed by the door frame."
Moreover, even if the court were to credit this testimony, the
Trooper offered no objective evidence that Hernandez changed his
behavior due to the Trooper's presence.[8]

Later, the Trooper testified that when he first initiated
contact with Hernandez he appeared "very stiff" and "anxious."
The Trooper then explained that Hernandez appeared to "calm
down" after learning that he had been stopped for tailgating.
The Trooper also testified that Hernandez's overall demeanor was
"stiff" and "nervous" at several later points during their
interaction: when they were discussing whether the Trooper knew
Hernandez and when they discussed the Kittery Outlets and what
Hernandez intended to buy there.  On re-cross-examination, the

---

[8] The Trooper did not testify about Hernandez's posture at
the time he saw Hernandez pass through the tolls or at any time
before the Trooper pulled alongside him.

Trooper altered his testimony, describing Hernandez as "excessively nervous."

The court does not find this testimony particularly credible. The Trooper did not clarify at what point Hernandez became nervous again after he had calmed down upon learning the reason for the stop. Further, other than describing Hernandez as "stiff," the Trooper did not offer any objective indications of Hernandez's nervousness, such as sweating, shaking, fumbling paperwork, or failure to make eye contact. There was no credible evidence that Hernandez's behavior rose above the level of nervousness exhibited by the average person stopped by the police. See United States v. McKoy, 428 F.3d 38, 40 (1st Cir. 2005) ("Nervousness is a common and entirely natural reaction to police presence. . . .").

The government also relied heavily on the Trooper's testimony that Hernandez exhibited certain "suspicious" behaviors. The court finds that some aspects of this testimony strain credulity. First, the Trooper testified that it was suspicious that, when he pulled alongside Hernandez, Hernandez had his hands on the steering wheel in a "ten and two manner" while concealing his body behind the doorframe. Viewed from the perspective of an objectively reasonable officer, there is nothing suspicious about a driver placing his hands at "ten and two" on the steering wheel. See United States v. Dukes, 257 F.

App'x 855, 856 n.1 (6th Cir. 2007) (observing that defendant's "law-abiding behavior" of sitting rigidly with her hands "in the ten-and-two position" and failing to look at the police as she drove by "cannot be the basis of either probable cause or reasonable suspicion").

Second, the Trooper described Hernandez as initially acting standoffish and giving quick answers, which gave the Trooper the impression that Hernandez wanted to hurry the interaction along. Viewed objectively, a reasonable officer would not find this suspicious, especially given that Hernandez is a member of a racial minority and may have had mixed experiences with the police in the past. Cf. Illinois v. Wardlow, 528 U.S. 119, 132 (2000) (Stevens, J. concurring in part and dissenting in part) (observing that, especially among minorities, flight may not indicate guilt but, rather, the minority's belief "that contact with the police can itself be dangerous"). Similarly, Hernandez's attestation that he had no arrest record and his attempts to start a conversation about Pep Boys may have been intended to combat any negative stereotypes he expected the Trooper might hold.

In short, the court finds it difficult to credit—and therefore to defer to—the Trooper's testimony about what facts he found suspicious, especially where he testified that Hernandez's hands on the steering wheel at "ten and two"

bolstered his suspicion of criminality.  Drivers are taught to
drive with their hands on the wheel at "ten and two."  <u>See</u>
<u>United States v. Peters</u>, No. 1:11-cr-00085-JMS-KPF, 2012 WL
1120665, at *8 (W.D. Ind. Apr. 3, 2012) (observing that "ten and
two" position is "commonly taught in many driver's education
courses").  Were Hernandez's hands in a position other than "ten
and two" and in some way not visible to the Trooper, the Trooper
could have used that fact to support a concern that Hernandez
was hiding his hands from the Trooper's view.  Similarly lacking
in credibility was the Trooper's reliance upon the anxiety of
Hernandez (a non-Caucasian male whom he had just pulled over) as
support for his belief that Hernandez was engaged in criminal
activity.  In these times, it makes as much sense for a Trooper
to be suspicious about a driver who appears perfectly calm after
being pulled over, particularly where the driver is a non-
Caucasian male.  The bottom line here is that the Trooper's use
of these kinds of neutral or innocent facts to support his
suspicion of criminality draws into doubt the credibility of his
reliance on other facts to support his suspicion of Hernandez's
criminal activity.

The totality of the remaining facts, objectively viewed,
describes a considerable number of people traveling on our
nation's highways for perfectly legitimate reasons.  The Supreme
Court has recognized that reasonable suspicion may rest on

factors that are individually consistent with "innocent travel" but collectively amount to reasonable suspicion. United States v. Sokolow, 490 U.S. 1, 9 (1989). Consistent with this principle, the Fourth and Eleventh Circuits apply the rule that, in order to support reasonable suspicion that criminal activity is afoot, the facts viewed in their totality must "serve to eliminate a substantial portion of innocent travelers." United States v. Williams, 808 F.3d 238, 246 (4th Cir. 2015) (internal quotation marks omitted); United States v. Boyce, 351 F.3d 1102, 1109 (11th Cir. 2003). As stated by the Tenth Circuit: "Although the nature of the totality of the circumstances test makes it possible for individually innocuous factors to add up to reasonable suspicion, it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." United States v. Wood, 106 F.3d 942, 948 (10th Cir. 1997) (internal quotation marks omitted). The Eighth Circuit has stated much the same:

> While we are mindful that conduct which would be wholly innocent to the untrained observer might acquire significance when viewed by an agent who is familiar with the practices of drug smugglers and the methods used to avoid detection, it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.

[United States v. Beck](#), 140 F.3d 1129, 1137 (8th Cir. 1998)
(internal quotation marks, citations, and ellipsis omitted).

Prior to asking Hernandez to exit the car, the Trooper observed insufficient facts to establish articulable and reasonable suspicion that Hernandez was engaged in criminal conduct.  The facts relied upon by the government to establish reasonable suspicion of criminality at that point in time do not distinguish Hernandez from an innocent traveler.  First, with respect to the reason for the stop, the Trooper testified that hundreds of cars every day travel within a car length of the car in front of them for short periods of time.  Thus, at the outset, Hernandez was guilty of doing something the Trooper had seen hundreds of times every day.  The Trooper conceded that millions of people drive rental cars for perfectly legal reasons.  The Trooper also admitted that many people—including innocent travelers—change their behavior after seeing a police cruiser, often by stiffening up or becoming nervous.

Regarding Hernandez's travel route, the Trooper testified that Interstate 95 is a "known drug corridor" and that he knows the Kittery Outlets specifically to be used for drug transactions.  But he also testified that Interstate 95 is an "extremely busy highway," that all of Vermont, New Hampshire, and Maine are considered drug destination areas, and that drug transactions occur at various locations throughout these states.

See United States v. White, 584 F.3d 935, 951-52 (10th Cir. 2009) ("Because law enforcement officers have offered countless cities as drug source cities and countless others as distribution cities . . . the probativeness of a particular defendant's route is minimal."); Beck, 140 F.3d at 1138 n.3 (collecting cases identifying various states and major cities as "source" locations).  Even when viewed together, these facts do not distinguish Hernandez from innocent travelers and are therefore weak facts in favor of reasonable suspicion.

The government relies on three additional factors in support of reasonable suspicion: the presence of two unopened bags of rubber bands; Hernandez's apparent intent to shop for Hollister jeans although there is no Hollister store at the Kittery Outlets; and Hernandez's apparent inconsistent statement about when he rented the car.  First, with respect to the rubber bands, the Trooper testified that rubber bands are often used after drug transactions to bundle cash.  Here, however, the rubber bands were found in the back of the car next to cleaning supplies.  The Trooper conceded that this combination was not suspicious or indicative of drug trafficking.  Rubber bands would more powerfully indicate drug trafficking when paired with other tools of the trade (e.g. baggies or a scale) or other facts suggesting the presence or use of drugs (e.g. an odor of marijuana or signs of impairment).  Without more to tie the

rubber bands to criminality, it seems an unreasonable inference
that these two unopened bags of rubber bands in this rental car
were used, or destined to be used, for drug trafficking.

Second, with respect to the Hollister jeans, Hernandez
consistently stated that he was going to the Kittery Outlets to
buy Hollister jeans; his story did not change.  And he was on a
direct route to his stated destination.  Had Hernandez changed
his story or been inconsistent as to his itinerary, the
Trooper's suspicions would have been more credible.  But the
evidence that Hollister jeans can only be purchased at a
Hollister store came from the Trooper's own anecdotal experience
of shopping at Hollister.  Hernandez's shopping plans did not in
any way indicate criminality.  Cases where a defendant's
inconsistent statements support reasonable suspicion rest on far
more than what was present here.  Cf. Dion, 859 F.3d at 125-26,
128 (finding reasonable suspicion when defendant with Colorado
plates and an Arizona license was stopped in Kansas and stated
he was returning from a cross-country road trip to visit his CPA
in Pennsylvania); Wood, 106 F.3d at 947 (observing that
defendant's misstatement of city where he rented car could
support reasonable suspicion if it suggested he was trying to
conceal fact that he had been in a known source state).

Likewise, the apparent inconsistency between Hernandez's
statement about when he retrieved the car and the date on the

rental agreement does not further the drug-trafficking theory or indicate criminal activity generally.  At most, this inconsistency would indicate to a reasonable officer that Hernandez might have lied about when he rented the vehicle.  But to what end?  There is no reasonable inference to be drawn, on these facts, that Hernandez lied about when he rented the vehicle to obscure some aspect of his drug-trafficking scheme.[9]

Importantly, the Trooper also learned several facts before he asked Hernandez to step out of the car that actually should have dispelled some of his concerns.  The Trooper quickly resolved the "odd" color inconsistency: based on the fact that the rental agreement stated the car color as black, the Trooper reasonably concluded that the registration mistakenly listed the color as red.  He also learned that Hernandez had a valid license and no outstanding warrants.  Notably absent from the Trooper's observations were any signs of impairment, smell of

---

[9] Relying on United States v. Wright, 582 F.3d 199, 213 (1st Cir. 2009), the government argues that the inconsistency between Hernandez's statement that he rented the vehicle that day and the date on the rental agreement constituted an "ambiguity" that the Trooper was entitled to follow-up on and clarify.  Assuming for the sake of argument that Wright supports that proposition, this court must follow the law as more recently prescribed in Rodriguez: that the police must have reasonable suspicion, not merely some unresolved ambiguity, in order to justify prolonging the stop beyond those inquiries reasonably related to the purpose of the stop.  See Rodriguez, 135 S. Ct. at 1616.

alcohol or marijuana, or any furtive movements, indicating that
Hernandez might be trying to conceal contraband.

The totality of the circumstances occurring prior to the
Trooper's request for Hernandez to exit the car, viewed from the
perspective of a reasonable officer, does not provide a
particularized and objective basis for reasonable suspicion that
Hernandez was involved in drug-trafficking. See Reid v.
Georgia, 448 U.S. 438, 441 (1980) (holding that arriving to
airport early in morning, when law enforcement presence is
diminished, from known drug-source city with minimal luggage was
insufficient to support reasonable suspicion); Boyce, 351 F.3d
at 1109 (holding no reasonable suspicion supported extension of
stop when defendant was driving rental car on widely used
interstate known as a drug corridor and planned to return his
rental car late because those facts "would likely apply to a
considerable number of those traveling for perfectly legitimate
purposes" (internal quotation marks omitted)); Williams, 808
F.3d at 247, 252-53 (same result when defendant was traveling in
rental car on known drug corridor late at night, his stated
travel plans were inconsistent with duration of rental
agreement, and he made apparently inconsistent statements about
his address); see also Garcia, 53 F. Supp. 3d at 511 (finding no
reasonable suspicion supporting extension of traffic stop based
on facts including driver's and defendant's unusually nervous

behavior and defendant's and other passenger's history of drug involvement).

The extension of the stop to the point when the Trooper asked Hernandez to exit the car violated the Fourth Amendment and was unlawful.  If the opposite were true, the vast majority of travelers on our nation's highways would be subject to extended detention during a routine traffic stop.  Cf. Reid, 448 U.S. at 441 (holding facts insufficient to support reasonable suspicion because they "describe[d] a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude" those facts could justify a seizure).

D.  Summary

In sum, the teaching of Rodriguez is clear: the Fourth Amendment requires officers to end a traffic stop once its mission is—or reasonably should be—over.  Rodriguez, 135 S. Ct. at 1614.  Here, a driver was stopped for following another car too closely.  The Trooper conceded that he witnessed "hundreds" of that same traffic violation every day.  The Trooper did not ask the driver why he was tailgating, or questions designed to determine whether he might be distracted or impaired, or whether there might be some other reason for the traffic violation.  The driver had a valid license and no outstanding warrants.

Objectively, there was no reason for the Trooper to prolong this minor traffic violation stop to the point that the Trooper requested the driver to exit his car.  Had the Trooper been concerned about the driver's impairment, or his own safety, such a request would have been reasonable.  The request would also have been reasonable in the presence of a fact—in addition to the rubber bands—that pointed toward criminality: odor of marijuana or alcohol; visible sign of drug use; presence of drug paraphernalia; attempt to conceal items inside the car from view; an outstanding arrest warrant; a suspended license, etc. Although an incriminating fact (i.e., the wad of cash in his pocket) developed after the driver exited the car and walked behind the car, the Trooper was not aware of that fact when he asked the driver to exit the car.

This stop should have ended once the Trooper learned that the driver's license was valid and there were no outstanding warrants.  The Trooper should have returned to the car merely to give the driver his papers and communicate the result of the stop (i.e., a violation, warning, or nothing).  By prolonging the stop beyond that point and asking the driver to exit his car to further investigate, the Trooper violated the Fourth Amendment.  The court therefore concludes that the government has not met its burden of showing that the seizure here was

sufficiently limited in its nature and duration.  See _Royer_, 460
U.S. at 500; _Acosta-Colon_, 157 F.3d at 14.

III. <u>Fruit of the Poisonous Tree</u>

The court concludes that the Trooper's request for
Hernandez to exit the car extended the stop and violated the
Fourth Amendment.  But the question remains whether the drugs
the Trooper subsequently recovered from Hernandez's car must be
suppressed.

The Fourth Amendment's prohibition on unreasonable searches
and seizures "is enforced through the exclusionary rule, which
excludes evidence seized in violation of the Fourth Amendment."
United States v. Camacho, 661 F.3d 718, 724 (1st Cir. 2011).
"Evidence obtained during a search may be tainted by the
illegality of an earlier Fourth Amendment violation, so as to
render such evidence inadmissible as 'fruit of the poisonous
tree.'"  <u>Id.</u> at 728 (internal quotation marks omitted).
Specifically, a defendant's consent to search may be invalidated
if it "bears a sufficiently close relationship to the underlying
illegality."  United States v. Smith, 919 F.3d 1, 11 (1st Cir.
2019) (internal quotation marks and brackets omitted).  The
government bears the burden of showing that the causal
connection between the illegal act and the defendant's consent
was broken and that the evidence is therefore admissible.  <u>See</u>

Brown v. Illinois, 422 U.S. 590, 604 (1975); see also e.g.,
United States v. Alvarez-Manzo, 570 F.3d 1070, 1077 (8th Cir.
2009) ("[T]o purge the taint, i.e. prevent the application of
the 'fruit of the poisonous tree' doctrine, the government bears
the burden of demonstrating that the voluntary consent was an
independent, lawful cause of the search.").

   Despite bearing the burden on this issue, the government
makes no attempt to show that any causal connection between the
unlawfully extended stop and Hernandez's subsequent consent to
search the vehicle was severed.  Instead, the government argues
only that Hernandez's consent was voluntary, doc. no. 15 at 11,
which is a distinct issue from whether the consent was tainted
by the prior unlawful detention.  See Smith, 919 F.3d at 11-14
(addressing taint and voluntariness of consent separately).
Because the government has failed to meet its burden on this
issue, the court finds that the evidence obtained as a result of
the consent search is "fruit of the poisonous tree" and must be
suppressed.  See Alvarez-Manzo, 570 F.3d at 1077-78 (upholding
district court's suppression of evidence when government made no
attempt to show that taint of prior constitutional violations
had been purged prior to his consent to search); United States
v. Reeves, 524 F.3d 1161, 1170-71 (10th Cir. 2008) (reversing
district court's denial of motion to suppress when government

completely failed to address whether taint of unlawful arrest had been purged prior to consent).

**CONCLUSION**

For the foregoing reasons, Hernandez's motion to suppress the evidence obtained as a result of the search of his vehicle during the traffic stop, doc. no. 14, is granted.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

July 9, 2019

cc: Charles J. Keefe, Esq.
    Charles L. Rombeau, Esq.
    U.S. Probation
    U.S. Marshal